IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL RIVLIN, | CIVIL ACTION |
| Plaintiff, | |
| v. | NO. 19-1497-KSM |
| ZIMMER BIOMET, et al., | |
| Defendants. | |

MEMORANDUM

**MARSTON, J.** September 30, 2021

      Plaintiff Michael Rivlin brings negligence claims against Defendants Zimmer Biomet Holdings, Inc.[1] and Biomet Leasing, Inc. for injuries that he sustained while flying from Philadelphia International Airport to Zimmer's headquarters in Warsaw, Indiana. Rivlin has filed two motions *in limine*, and Defendants have filed three. For the reasons discussed below, Rivlin's motions are denied, and Defendants' motions are granted in part and denied in part.

      Because we write only for the parties, we do not include a detailed recitation of the facts in this Memorandum. A more thorough recitation of the facts is included in this Court's previous opinion on Defendants' motion to strike the expert opinion of former commercial pilot Marc A. Fruchter. (*See* Doc. No. 42.)

**I.**     ***Rivlin's Motions in Limine***

      Rivlin has filed two motions *in limine*. The first, seeks to exclude certain articles and online references that are cited in the report of defense expert, Matthew Raver. (Doc. No. 36.)

---

[1] Zimmer Biomet Holdings, Inc. asserts that it has been incorrectly identified in the complaint as "Zimmer Biomet." (Doc. No. 27-2 at p. 1.)

Defendants respond that they will not seek to introduce any of the materials at trial. (*See* Doc. No. 50.) Therefore, the Court denies this motion as moot.

Second, Rivlin moves to preclude defense expert Elizabeth Austin, Ph.D. under Federal Rule of Evidence 702, arguing that her opinion is irrelevant, not helpful to the jury, and unfairly prejudicial. (Doc. No. 37.) Defendants argue that Rivlin's motion should be denied as untimely. (Doc. No. 55 at p. 1 n.1.) We agree. The Court's August 10, 2020 Scheduling Order set the deadline for all *Daubert* motions as August 20, 2020. (Doc. No. 25 at ¶ 4.) Rivlin did not file his motion to exclude Dr. Austin's opinions until October 30, 2020. (*See* Doc. No. 37.) He has not provided any justification for missing the deadline listed in the Court's Scheduling Order, let alone demonstrated good cause. Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); *see also Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 318 (3d Cir. 2020) (affirming district court's denial of motion to amend because "Rule 16(b)(4) applies once a scheduling-order deadline has passed, and Premier did not show good cause") Therefore, we deny Rivlin's motion as untimely.

In the alternative, even if we were to consider the merits of Rivlin's motion, we find Dr. Austin's testimony relevant to the issues in this case. Rivlin argues that the pilots on his flight violated "the Federal Aviation Regulations when they turned off the fasten seatbelt sign in spite of weather reports that indicated clear air turbulence (an AIRMENT [sic] and high level wind charts)." (Doc. No. 37 at p. 2.) Dr. Austin has a doctorate degree in atmospheric physics. (Doc. No. 37-2 at p. 47.) And in her reports, she not only explains the nature of clear air turbulence and reviews the available upper level wind charts, but also opines that the "upper level wind charts . . . and AIRMET would NOT have alerted the crew to the possibility of encountering the severe CAT they hit." (Doc. No. 51-10 at p. 9; Doc. No. 37-2 at pp. 12, 40, 44–46.) This

analysis is directly relevant to the primary issues in this case and is likely to help the jury decide whether the pilots should have left on the seatbelt sign given the forecasts reflected in the AIRMET and upper level wind charts.  *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (explaining that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility" (internal quotation marks omitted)).

For those reasons, Rivlin's motions *in limine* are denied.

## II. *Defendants' Motions in Limine*

Defendants have filed three motions *in limine*.  First, they move to exclude Rivlin's "PIREP chart," which is a map that shows multiple pilot reports ("PIREP") that were issued along the flight path on days other than the day of the accident.  (Doc. No. 33.)  Rivlin responds that he will not offer this evidence at trial.  (Doc. No. 53.)  Therefore, Defendants' first motion is denied as moot.

Next, Defendants move to exclude any reference to the current version of FAA Advisory Circular 120-88A (Doc. No. 34) and any reference to Pilot in Command Barry Lintz's post-incident emails, the Biomet Safety Report that Lintz submitted after the accident, and any remedial measures taken by Defendants because of the accident (Doc. No. 35).  We discuss each motion in turn.

### A. *FAA Circular 120-88A, Change 1*

Defendants move to preclude the introduction of the current version of FAA Advisory Circular 120-88A, along with any testimony about Circular 120-88A, arguing that it is irrelevant and therefore, must be excluded under Federal Rule of Evidence 402.  (Doc. No. 34.)

Under Rule 402, "[r]elevant evidence is admissible" unless precluded by another rule,

federal statute, or the United States Constitution.  Fed. R. Evid. 402.  "Irrelevant evidence is not admissible."  *Id.*  "Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Defendants argue that the current version of Circular 120-88A is irrelevant because it does not apply to flights operated under part 91, and the flight at issue here was a part 91 operation.  (Doc. No. 34-1 at pp. 2–3.)

The FAA issues advisory circulars, like Circular 120-88A, to get information about regulations and operations to the aviation community.  *See* FAA, Cabin Safety Subject Index at p. 7 (June 25, 2020).  For Circular 120-88A, the focus is on "information and practices that can be used to prevent injuries caused by turbulence."  Adv. Cir. 120-88A, Change 1, § 1 (Nov. 19, 2007).  And Circular 120-88A's intended audience is:

> Managers, trainers, flight crew (pilots and flight engineers), flight attendants (F/A), aircraft dispatchers, and others involved in flight operations under part 121 should be familiar with the contents of this AC.  This AC may also be valuable to persons associated with operations under part 125, part 135, *part 91, subpart K (fractional ownership programs)*.

*Id.* at § 5 (emphasis added).  The parties offer two different interpretations of the italicized language.  Defendants argue that it references *only* subpart K of part 91, and therefore, the Circular does not apply to part 91 operations generally.  (Doc. No. 34-1 at p. 2.)  By contrast, Rivlin argues that the list refers to all part 91 operations, including those under subpart K.  (Doc. No. 54 at p. 7.)

We are inclined to agree with Rivlin.  First, we note that the text of the Circular is ambiguous on this issue.  The comma between "part 91" and "subpart K," suggests that they are distinct items within the list, and therefore, that the Circular applies to the entirety of part 91, as well as subpart K.  However, this reading also renders the separate reference to subpart K

4

superfluous.

The precursors to the current version of Circular 120-88A, shed light on the issue. In November 2005, the FAA issued Advisory Circular 120-88, the first Circular on "Preventing Injuries Caused by Turbulence." Under section five of the Circular — titled, "Who should read this AC?" — it states, "This AC may also be valuable to persons associated with operations under part 125, part 135, subpart K of part 91 (fractional ownership programs), *and part 91*." FAA, Advisory Circular 120-88, § 5 (Nov. 11 2005) (emphasis added). In January 2006, Circular 120-88 was cancelled and replaced by the initial version of Circular 120-88A, which again states, "This AC may also be valuable to persons associated with operations under part 125, part 135, subpart K of part 91 (fractional ownership programs), *and part 91*." FAA, Adv. Cir. 120-88A, § 5 (Jan. 19, 2006) (emphasis added). These iterations show that the FAA will sometimes list subpart K of part 91 as a separate entry in a list that also references part 91 generally.

It was only in the most recent version of the Circular that the language changed to say, "This AC may also be valuable to persons associated with operations under part 125, part 135, part 91, subpart K (fractional ownership programs)." FAA Adv. Cir. 120-88A, Change 1, § 5 (Nov. 19, 2007). The current version of Circular 120-88A also includes a change page that states the Circular has been "revised to remove information about" two reporting systems "due to product unavailability" and to "update all references in the document." Nowhere does the change page suggest that the FAA meant to exclude the majority of part 91 operators from the potentially-interested audience list or to otherwise limit the relevant audience. In addition, the substance of the current version is largely the same as the previous two, suggesting that the information in the Circular remains relevant to all operations under part 91, and is not limited to

operations under subpart K.

Given this history, we read the current version of Circular 120-88A as being "valuable to persons associated with operations under part 125, part 135, part 91, [and] subpart K (fractional ownership programs) [of part 91]." This interpretation is consistent with the Circular's previous iterations, and confirmed by the testimony of expert Marc Fruchter, who opined that Circular 120-88A is highly relevant to this case because the audience section "calls out all of the types of operations" including the part 91 operations at issue here.[2]

Because Circular 120-88A includes "valuable" information for part 91 operators, and details how those operators may prevent injuries caused by turbulence, it is relevant to the issues in this case and will be admitted at trial.[3]  Defendants' second motion is denied.

### B.    *Subsequent Remedial Measures*

Last, Defendants move to preclude two post-accident emails from Lintz to Zimmer Biomet employees Tony Collins and Chad Phipps, one from January 21, 2017 and one from

---

[2] Rivlin asserts that the Court recognized the relevance of Circular 120-88A in our previous opinion admitting Fruchter's expert opinion.  (Doc. No. 54 at p. 6 ("This Court has already recognized that Advisory Circular 120-88A is patently relevant as a basis of Mr. Fruchter's expert opinions.").)  This is not entirely accurate.  In our previous opinion, we noted that in addition to the FAA regulations governing preflight safety briefings, Fruchter also relies on the "2007 FAA Circular, which encourages crew members to 'promptly and clearly communicate turbulence advisories, including specific directions to flight attendants and passengers.'"  (Doc. 46 at p. 12 (quoting Circular 120-88A).)  This conclusion was based in part on Fruchter's testimony that he reviewed the Circular while preparing his expert report (Hr'g Tr. at 18:19–25) and that in his opinion, the Circular "plays very heavily upon this case" (*id.* at 19:1–3) because the audience section "calls out all of the types of operation" including part 91 operations (*id.* at 28:20–24).

In addition, we note that at no point in the briefing on Defendants' motion to exclude Fruchter's testimony or during the Daubert hearing did Defendants argue that Circular 120-88A applies only to subpart K operations under part 91.  (*See* Doc. Nos. 26, 31; *see also* Doc. No. 44 at 86:7–88:3.)

[3] Although we will allow Rivlin to introduce Circular 120-88A at trial, we note that the Circular draws a distinction between part 121 operations and other operations, stating that part 121 operators "*should be* familiar with the contents of this AC," while it is merely "valuable" to operations under part 91.  FAA, Adv. Circ. 120-88A, Change 1, § 5.  If Defendants wish, the Court will entertain a request for a limiting instruction regarding the Circular and part 91 operators.  Defendants should meet and confer with Plaintiff prior to submitting any such request.

January 23, 2017 (Doc. No. 35-5), along with the Biomet Safety Report that Lintz submitted after the accident (Doc. No. 35-4) and any reference to remedial measures taken by Defendants in response to the accident. (*See generally* Doc. No. 35.)

Federal Rule of Evidence 407 renders inadmissible evidence about subsequent remedial measures:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction. But the court may admit this evidence for another purpose, such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures.

For example, in *In re Consolidation Coal Co.*, a deckhand fell from a ship deck, hitting his head and losing all memory of the accident. 123 F.3d 126, 131 (3d Cir. 1997). The deckhand sued the ship owner, arguing that the injury occurred when the rope that acted as the ship's leaving line broke, causing him to fall. *Id.* at 137. To support his version of events, the deckhand "attempted to introduce a Consol safety memo regarding the accident," which "stated than an employee fell after a leaving line *broke* and cautioned all employees to inspect ropes carefully before using them." *Id* at 136 (emphasis added). The company, which theorized that the plaintiff tripped and the rope was cut sometime after the accident, argued that the "memo was a subsequent remedial measure and thus inadmissible under Fed. R. Evid. 407." *Id.* The trial court agreed and excluded the report. *Id.* On appeal, the Third Circuit affirmed the ruling, holding that the trial court did not err in excluding the memo's investigatory summary in addition to the warning to inspect ropes carefully. *Id.* ("[T]here is authority supporting the exclusion of evidence of post-accident investigations under Rule 407.").

Similarly, in *Reynolds v. University of Pennsylvania*, a student in the University's Executive Masters in Technology Management ("EMTM") program brought a breach of contract

action against the University, arguing that the University misleadingly suggested that as an EMTM student, he was also student of the Wharton business school.  483 F. App'x 726, 728 (3d Cir. 2012).  After he filed suit, the University updated its website to clarify that while the EMTM program was co-sponsored by Wharton and graduates had access to the Wharton's alumni network, they were officially alumni of Penn Engineering and not the Wharton School.  *Id.* at 732.  The University also held a Town Hall meeting of students and administrators, where "administrators explained the place of the EMTM program within the University and then took questions from students about the nature of the program."  *Id.* at 729.  The trial court excluded evidence about the website revisions and the town hall as subsequent remedial measures, and on appeal, the Third Circuit affirmed.  *Id.* at 733.  The appellate court found that the district court did not abuse its discretion when it determined that "if the revisions to the website and the Town Hall meeting had occurred before [the EMTM student] enrolled, they would have reduced the likelihood of any possible confusion about what benefits [he] would receive as an EMTM student" and therefore, the were inadmissible, "subsequent remedial measures under Rule 407." *Id.*

Like the memo in *In re Consolidation Coal Co.*, Lintz's January 23, 2017 email outlines specific changes that Lintz makes to his own pre-flight planning process as well as changes made within the aviation department because of the accident:

- "I intend to have the pilots add the example of our occurrence to their verbal briefings to anyone new that rides on our aircraft to drive the point home that their seatbelts need to remain on."
- "Our group, aviation, will have a follow up discussion at our next safety meeting to consider further ways to avoid this."

(Doc. No. 35-5 at p. 3.)  Similarly, the Biomet Safety Report includes a detailed description of the incident, lists Lintz's suggested corrective actions, and summarizes the corrective actions

8

actually taken by the Department. (*See* Doc. No. 35-4.) Among other things, the "Suggested Corrective Action" section states:

- "It is worth the effort when checking the weather to check on Jetstream wind tracks to see where they are located in reference to your route of flight."

- "I have looked at Pireps given on weather briefings with some skepticism . . . however a little more study of ones that are available along with Jetstream location will be something I pay closer attention too."

- "Also we need to emphasize, especially to new passengers, to keep their seatbelts on at all times unless they need to stand up for some reason . . . . I intend to include a brief reference to this incident in all my future passenger briefings prior to flight as a way to reinforce getting them to keep their seat belts on."

- It is "worth spending some time considering how you would prioritize your response to this situation in order to prevent ending up with a deeper upset recovery scenario."

(*Id.* at p. 4.) And under the "Corrective Action" section, Lintz notes that the entire report "was discussed at the March 21, 2017 department meeting," and that in the future, pilots will consider the location of the jet stream when preparing for a flight and will reference the accident during passenger briefings. (*Id.* at p. 6.)

Rivlin attempts to distinguish *In re Consolidation Coal Co.* and *Reynolds*, arguing that the January 23rd email and Biomet Safety Report include mere suggestions that were never adopted. (Doc. No. 52 at p. 4.) In support of this proposition, Rivlin cites Lintz's deposition, where the pilot states that no written changes were made to the company's seatbelt rules. (*Id.*) He also cites First Officer Josh McClintic's deposition, which confirms that no formal changes were made to the safety management system as a result of this flight. (*Id.*) However, nothing in Rule 407 or the cases interpreting it requires that the remedial measure amount to a change in written or formal policy. Indeed, *In re Consolidation Coal Co.* and *Reynolds* suggest the opposite. *See In re Consolidation Coal Co.*, 123 F.3d at 136 (excluding memo because it

"cautioned all employees to inspect ropes carefully before using them"); *Reynolds*, 483 F. App'x at 733 (excluding reference to Town Hall meeting).

Instead, the relevant distinction is between those measures actually taken and those that are merely hypothetical. *See McDaniels v. City of Philadelphia*, 234 F. Supp. 3d 637, 650 (E.D. Pa. 2017) ("Rule 407's prohibition extends only to evidence of remedial measures that 'are taken," not those that are merely hypothetical."). For example, in *McDaniels*, in 2013, next of kin for a man killed by a police officer with the City of Philadelphia brought a § 1983 action against the police department. *Id.* at 650. The plaintiff attempted to rely on a report issued by the Department of Justice at the behest of the City of Philadelphia Police Commissioner. *Id.* at 641. Specifically, the Commissioner had "asked DOJ to provide technical assistance to the PPD, including an evaluation of its use-of-force policies." *Id.* at 641. And the report, which was released in 2015, identified "numerous deficiencies in PPD's use-of-force policies, training programs, and investigative procedures." *Id.* The City moved to exclude the report at trial, arguing that it was an inadmissible subsequent remedial measure under Rule 407. *Id.* at 650. The trial court disagreed, finding that "the DOJ report does not constitute an improvement in PPD's practices that would be barred by Rule 407 because it contains only recommendations, not actual remedial measures." *Id.*; *see also Valdez v. City of Philadelphia*, 2016 WL 2646667, at *4 (E.D. Pa. 2016) (finding that a police department report evaluating the police department's practices from 2007 to 2013 was not a subsequent remedial measure because the "Report *itself* does not contain any measures that would have made Valdez's alleged violation any less likely to occur; only the Philadelphia Police Department's decisions to *implement* those recommendations would have done so. Instead the Report is more accurately viewed as a sort of

'step zero' — providing facts, data, and conclusions that would guide future policy decisions, but not the policy decisions themselves.").

Unlike the reports in *McDaniels* and *Valdez*, which outlined problems and included mere recommendations, the changes outlined in Lintz's January 23rd email and the Biomet Safety Report are not hypothetical. To the contrary, Lintz's email states that he will have pilots advise future passengers about the incident and that the Aviation Department will "have a follow up discussion at our next safety meeting to consider further ways to avoid this." (Doc. No. 35-5 at p. 3.) Similarly, the Biomet Safety Report includes both "Suggested Corrective Action[s]" *and* chosen "Corrective Action[s]." And it confirms that the incident and the report itself were discussed at the Aviation Department meeting and that in the future, pilots will pay closer attention to the jet stream location and emphasize to passengers the importance of seat belt. (Doc. No. 35-4 at p. 6.)

Because Lintz's January 23rd email and the Biomet Safety Report are subsequent remedial measures, they are inadmissible under Rule 407 and will be excluded from trial, along with any discussion about their contents or the remedial measures taken by Defendants as a result of the accident.[4] However, Lintz's initial email on January 21, 2017 and its attachment merely describe the accident and neither suggests nor discusses potential remedial measures. (*See* Doc. No. 35-5 at pp. 1–2.) Therefore, this email and attachment are admissible and may be introduced at trial.

## IV. Conclusion

For the reasons discussed above, Rivlin's motions *in limine* are denied and Defendants' motions *in limine* are granted in part and denied in part. An appropriate order follows.

---

[4] The Court withholds ruling on whether these materials may ultimately be introduced for impeachment purposes.